IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| HENRY RAPHAEL JOHNSON, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:03CV01141 |
| | ) | |
| YORK SIMPSON UNDERWOOD, L.L.C., and | ) | |
| CAROL CAPPELLETTI, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

BEATY, District Judge.

This matter comes before this Court pursuant to Defendants York Simpson Underwood, L.L.C. ("York") and Carol Cappelletti's ("Cappelletti")(collectively "Defendants") joint Motion for Summary Judgment [Document #19]. Plaintiff Henry Raphael Johnson, Jr. ("Plaintiff" or "Johnson") filed suit in this case against York and Ms. Cappelletti, alleging discrimination under 42 U.S.C. §§ 1981 and 1982, on the basis of race. Plaintiff also brings a claim of unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1. Specifically, Plaintiff claims that he was denied access to an Open House where he had planned to make an offer on the house. In conjunction with Defendants' Motion for Summary Judgment, Defendants have also filed a Motion in Limine to Exclude Expert Testimony [Document #21].

I.   FACTUAL HISTORY

As is appropriate on a motion for summary judgment, the facts are presented in the light most favorable to Plaintiff based on the evidence before the Court. Plaintiff, who was twenty-three years old at the time of the incident complained of, is black. On May 16, 2003, he graduated from the University of North Carolina at Greensboro with a degree in social work. Three days after

graduation, he started work as a social worker in the Adult Services section of the Durham County Department of Social Services. Subsequently, Plaintiff lived with his cousin, Terrance Gause ("Gause"), who owns a home at 5808 Thistle Rock Lane, Durham, North Carolina. Gause was twenty-seven years old at the time of the incident. Plaintiff decided it was time to buy a house, and began looking in earnest. Plaintiff applied for a mortgage loan through First Financial Services in Raleigh, North Carolina, and was pre-qualified for a mortgage loan of $120,000. Plaintiff also contracted Mia DiMeglio-Ferguson ("Ferguson") to act as his buyer's agent. Prior to the incident in question, Plaintiff put bids down on two houses, both of which turned out to have structural problems.

On Wednesday, August 6, 2003, Plaintiff privately toured the house at 2805 Camberly Drive, the site of the incident in question, with Ms. Ferguson. Plaintiff favored the ranch-style house, which has a large, private back yard. This house was listed by Defendant York, a real estate agency that provides services related to advertising, listing, sale, and purchase of residential properties. The broker in charge of the property was Defendant Cappelletti, who is licensed by the North Carolina Real Estate Commission, and who became a real estate broker for York in March 2003. In its capacity as listing agent, York scheduled an Open House at 2805 Camberly Drive during the afternoon of Sunday, August 10, 2003. To advertise the Open House, Ms. Cappelletti placed an advertisement in the local newspaper and posted signs around the neighborhood and in front of the house.

Plaintiff decided he liked the house, based upon his first visit, but wanted his parents to see it before he put down an offer. However, the day of the Open House, Plaintiff's parents were busy with a church function. Plaintiff then decided to bring Mr. Gause and another cousin, Anthony

2

Johnson ("Johnson") to see the house. Prior to attending the Open House, Plaintiff called his agent, Ms. Ferguson, and asked what he should do. Ms. Ferguson told him that she did not need to be there, because it was an Open House. Therefore, Plaintiff, accompanied by Mr. Gause and Mr. Johnson, arrived at the Open House around 2:15 p.m. that Sunday. Plaintiff was dressed in an orange, short-sleeved pullover shirt and shorts. Mr. Gause was dressed in a green and white football jersey and denim shorts. Mr. Johnson was dressed in a white t-shirt and blue jeans. All three were bare-headed, that is, without any covering on their heads.

In front of the house was a York "for sale" sign that identified Ms. Cappelletti as the listing agent. Beside this sign was a red and white "Open House" sign. Plaintiff, upon arrival, parked his car in the driveway and led his two cousins across the yard and to the front door. Upon reaching the door, Plaintiff stepped on to the front step. Mr. Gause stood on a step behind Plaintiff, and Mr. Johnson stood on the ground, behind Mr. Gause. The front step was about four feet by five feet in diameter. The front door was open, and the house was shuttered only with a glass storm door.

After Plaintiff rang the doorbell, he watched Ms. Cappelletti, a 52-year-old white woman, approach from inside the house. Upon reaching the doorway, she said to Plaintiff in an angry voice, "What do you want?" Plaintiff then told her that he was there for the Open House. Ms. Cappelletti ordered Plaintiff to leave and not to return unless accompanied by a Realtor. Plaintiff, Mr. Gause, and Mr. Johnson then left, without saying another word. They returned to Plaintiff's car, got in the car, and drove out of the driveway. Plaintiff may have paused briefly in front of the house in order to write down Ms. Cappelletti's phone number from the "for sale" sign. As Plaintiff drove away, he called Ms. Ferguson on his cell phone to explain what had happened at the Open House.

After Plaintiff got back into his car, Ms. Cappelletti called 911 to report "three young black

3

males dressed in gang-like clothing seeking entrance to an open house held by a realtor." (Def. App. Mem. Supp. Mot. Summ. J., Ex. G, Aff. Ray, ¶ 2.) Durham County Deputy Georgette Ray ("Officer Ray") arrived on the scene about ten minutes after Plaintiff left. At that time, Ms. Cappelletti could not remember what kind of car Plaintiff drove. Nor could she remember details about the men themselves. Deputy Ray's affidavit and report state that the three men were young and black, and that their clothing was "gang-like". Neither document mentions anything about a threatening gesture.

As Officer Ray was about to leave, Ms. Cappelletti received a call from Ms. Ferguson. Ms. Ferguson told Ms. Cappelletti that she had received a call from her client, Plaintiff, who was very upset that Ms. Cappelletti had refused him entry. Ms. Cappelletti responded by saying, "Those were your clients?" and further stated that, "They don't look like your typical buyers." (Dep. Ferguson, at 50, 57.) Ms. Ferguson responded by stating that she does not have "typical buyers." (Id. at 57.) Ms. Cappelletti then told her that Ms. Ferguson was welcome to bring Plaintiff back to the house. Ms. Ferguson then told Ms. Cappelletti that an Open House was a time when home buyers could come without an agent to look at real estate. Ms. Ferguson then asked Ms. Cappelletti a second time to explain why she had refused entry to Plaintiff. Ms. Cappelletti then told Ms. Ferguson that she felt her safety was threatened. Ms. Ferguson asked her in what way was her safety threatened. Ms. Cappelletti responded that Plaintiff and his cousins looked to her to be gang members and not typical buyers. Ms. Cappelletti did not explain this statement further. She said nothing to Ms. Ferguson about Plaintiff's age, style of clothing, color of clothing, attitude, facial expressions, or gestures.

Plaintiff did not return to the Open House. Nor did he place a bid on the property, but

4

instead bought a house on Ardsley Drive in Durham, North Carolina.

Defendants contest some of these factual allegations. For example, Ms. Cappelletti asserts that Plaintiff and his cousins were all standing on the front step together. Ms. Cappelletti also asserts that at least one individual was wearing a red shirt and a red bandana on his head, which she associated with gang activity. Further, Ms. Cappelletti asserts that one individual was standing with his hand in front of his crotch when she entered the doorway, which she took to be suggestive of a potential sexual assault. Finally, Ms. Cappelletti asserts that Plaintiff lingered in his car in front of the house, which led her, in her fear, to call the police.

Plaintiff's suit alleges racial discrimination under 42 U.S.C. §§ 1981 and 1982, as well as unfair and deceptive trade practices, a violation of N.C. Gen. Stat. § 75-1.1. Defendants have filed a Motion for Summary Judgment. For reasons that follow, the Court finds that Plaintiff has stated a genuine issue of material fact, and so Defendants' Motion for Summary Judgment will be denied. But first, the Court will briefly address Defendants' other motion, a Motion in Limine to exclude Plaintiff's expert report.

II. MOTION IN LIMINE

Defendants argue that Plaintiff's expert report of Karyn D. McKinney ("McKinney") should be excluded. Plaintiff offers the report of Ms. McKinney, a university professor in social psychology, in order to show that (1) the circumstances of the case demonstrate blatant racial discrimination, and (2) the impact of this discrimination on Plaintiff. Ms. McKinney bases her expert testimony as to both of these areas on a review of discrimination literature and a phone conversation with Plaintiff. Defendants argue that Ms. McKinney's testimony should be barred because it invades the province of the jury to apply the law to the facts, impermissibly would equate

5

racial stereotypes with the Plaintiff in this case, does not meet the test of Rule 702 of the Federal Rules of Evidence, and is simply irrelevant. The Court finds that a final determination on the permissibility of Plaintiff's expert is better left for consideration during the trial. As such, Defendants' Motion in Limine is denied at this time.

III.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). There can be "no genuine issue as to any material fact" if the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case," since "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 265 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510. As a result, the Court will only enter summary judgment in favor of the moving party when " 'the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmoving] party cannot prevail under any circumstances.' " Campbell v. Hewitt, Coleman & Assocs., 21 F.3d 52, 55 (4th Cir. 1994) (quoting Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.2d 245, 249 (4th Cir. 1967)).

When ruling on a summary judgment motion, the Court "view[s] the evidence in the light

most favorable to the non-moving party, granting that party the benefit of all reasonable inferences." Bailey v. Blue Cross & Blue Shield, 67 F.3d 53, 56 (4th Cir. 1995). The moving party bears the initial "burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law." Catawba Indian Tribe v. South Carolina, 978 F.2d 1334, 1339 (4th Cir. 1992)(en banc). Once the moving party has met this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Id. In so doing, the nonmoving party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute. Anderson, 477 U.S. at 248–49, 106 S. Ct. at 2510; Catawba Indian Tribe, 978 F.2d at 1339. In other words, the nonmoving party must show "more than . . . some metaphysical doubt as to the material facts," for the mere existence of a scintilla of evidence in support of its position is insufficient to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); Catawba Indian Tribe, 978 F.2d at 1339. Defendants have asserted their Motion for Summary Judgment with respect to all of Plaintiff's claims. The Court will address Defendants' Motion in turn with respect to each of Plaintiff's claims.

    A. 42 U.S.C. § 1981

    Section 1981 grants all person within the jurisdiction of the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). This right extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b). To prove a violation of § 1981, a plaintiff must be able to show that he is (1) a member of a racial minority, (2) that the defendant intended to discriminate against him on the basis of race,

7

and (3) the discrimination concerned a privilege protected under § 1981.  See Morris v. Dillard Dep't Stores, Inc., 277 F.3d 743, 751 (5th Cir. 2001).

Plaintiff may meet his burden to prove that race was a determining factor in Defendant Cappelletti's actions denying him access to the Open House in one of two ways: "under ordinary principles of proof by any direct or indirect evidence relevant to and sufficiently probative of the issue," Goldberg v. B. Green & Co., Inc., 836 F.2d 845, 847 (4th Cir. 1988), or through the judicially created, burden-shifting proof scheme created for Title VII in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), which courts have subsequently applied in §§ 1981 and 1982 cases to allow Plaintiffs to defeat summary judgment in cases where Plaintiffs do not have direct or indirect evidence of discrimination.  See Dobson v. Cent. Carolina Bank & Trust Co., 240 F. Supp. 2d 516, 520 (M.D.N.C. 2003).  Under the McDonnell Douglas proof scheme, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence.  Id. Subsequently, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions.  Id.  If the defendant makes such a showing, the burden then shifts to the plaintiff to present evidence to prove that the defendant's articulated reason is pretext for unlawful discrimination.  Id.

Plaintiff argues, however, that he has presented direct evidence that proves that Defendant Cappelletti's actions were motivated, at least in part, by a discriminatory motive.  Defendants, in turn, argue that the use of the descriptive terms "gang-like" and "black" to law enforcement officers, and the further use of the word "gang-like" to Ms. Ferguson, do not suggest racial animus. This Court agrees with Defendants, and finds that use of the word "gang-like" in and of itself is not direct evidence of a racial animus, because it still requires the Court to infer a racially discriminatory

8

meaning from Ms. Cappelletti's actions and words given that the reference to gang members or gang ties is not exclusively tied to one particular race. Evidence is too speculative to be direct evidence where it does not "reflect directly on the alleged discriminatory attitude and . . . bear directly on the contested . . . decision." See Eddy v. Waffle House, Inc., 335 F. Supp. 2d 693, 698 n.7 (D.S.C. 2004)(citation omitted). Therefore, because Plaintiff's discrimination claim is not based upon direct evidence, but rather is "based on inferences to be drawn from circumstantial evidence, it is governed by the familiar burden-shifting analysis." See Williams v. Lindenwood Univ., No. 01-1725, 2002 U.S. App. LEXIS 8057, *15 (8th Cir. May 1, 2002).

Defendants urge this Court to find that in order to establish a prima facie case of racial discrimination in the housing context under McDonnell Douglas, that it is necessary to show that, (1) Plaintiff is a member of a racial minority, (2) Plaintiff applied to purchase the property, (3) Plaintiff was qualified for, or was otherwise ready, willing, and able to buy the property on the seller's terms, (4) Defendants refused to sell the property to him, and (5) that the property remained available for sale thereafter on terms similar to what Plaintiff offered, or that the house was later sold to someone outside of Plaintiff's racial group. See Selden Apartments v. United States Dep't of Housing & Urban Dev., 785 F.2d 152, 159 (6th Cir. 1986). Defendants do not contest that Plaintiff is a member of a racial minority. However, Defendants argue that Plaintiff cannot show that he applied to purchase the property, that he was qualified to do so, that Defendants then refused to sell to him, or that the property was later sold to someone outside of Plaintiff's racial group.

This Court finds that Defendants' test to determine a prima facie case in this instance is too limiting and not in accordance with the history and purpose of § 1981. See Dobson v. Cent.

9

Carolina Bank and Trust, 240 F. Supp. 2d 516, 522 (M.D.N.C. 2003)(stating that the legislative history of the Civil Rights Act of 1991 shows that in amending § 1981 Congress reaffirmed the view that § 1981 is a "critically important tool used to strike down racially discriminatory practices in a broad variety of contexts." (quoting H. Rep. No. 102-40, pt. II, at 36 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 729 (Report of House Judiciary Committee on Civil Rights Act of 1991))). Additionally, the prima facie case is supposed to serve as a channeling device that is not a difficult requirement to satisfy. See Dobson, 240 F. Supp. 2d at 521-22 (citing to Gibson v. Old Town Trolley Tours, 160 F.3d 177, 181 (4th Cir. 1998)). In this case, where Plaintiff was refused access to both the house and the broker in charge of the property, and Plaintiff has alleged that he had intended to place a bid on the house, it would not be appropriate to require as part of a prima facie case that Plaintiff continue to try to put a bid down on the house in order to create an inference of discrimination. To allow such an overly formulaic approach to the prima facie test in this case would be to sanction discrimination as long as it occurs to prevent Plaintiff from making his offer, but not to sanction discrimination as to that offer once made. For example, just as it would be a violation of § 1981 to refuse to serve racial minorities at the lunch counter, it is as much a violation to refuse to allow racial minorities into the restaurant to take a seat to be served. See Morris v. Office Max, 89 F.3d 411, 414 (7th Cir. 1996)(finding no violation of § 1981 but stating that the store patrons at issue were "denied neither admittance nor service, nor were they asked to leave the store.").

Therefore, instead of applying the prima facie test usually applied in housing cases, this Court instead will look to the prima facie test adopted by the Fourth Circuit when considering cases of public accommodation, which the instant case more closely analogizes. As such, the Court finds

10

that to establish the prima facie case, Plaintiff must establish that (1) he is a member of a protected class, (2) he sought to enter a contractual relationship with Defendants, (3) he met the Defendants' ordinary requirements to pay for and to receive services ordinarily provided by the Defendants to other similarly situated customers, and (4) he was denied the opportunity to contract for goods or services that were otherwise afforded to persons outside of the protected class. See Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004). In cases such as this one, where there were no other customers around to compare the treatment that Plaintiff received with their treatment, Plaintiff can also satisfy this fourth element by showing that he received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable. Id. at 668 n.5; see also Dobson, 240 F. Supp. 2d at 520; Callwood v. Dave & Buster's, Inc., 98 F. Supp. 2d 694, 707 (D. Md. 2000).

For the purpose of considering Defendants' Motion for Summary Judgment, the Court finds that the facts most favorable to Plaintiff as to the issue of determining whether Plaintiff's experience at the Open House is covered by § 1981 reveal the following: The Court finds that Plaintiff has alleged that he favored the house, had planned to make an offer on the house, and had been pre-approved for a mortgage that was within $5,000 of the asking price for the home. As such, Plaintiff has made a showing that he was prevented from negotiating for the home, which impeded his right to make a contract. Plaintiff has further shown that he met the Defendants' ordinary requirements to receive services, in that he arrived at the Open House at the time advertised and attempted to enter the Open House with his cousins. Open Houses by their very nature do not require potential home buyers to be accompanied by Realtors. And finally, Plaintiff has shown that he received services in a markedly hostile manner in that he was turned away from the door by Defendant

11

Cappelletti, and was later the object of a phone call by Defendant Cappelletti to police asserting that she felt threatened by Plaintiff's mere presence at the house with his companions who she described to the police as three black males dressed in gang-like clothing.

Defendants argue, however, that because Ms. Cappelletti showed the house to other individuals that same day, including black individuals, and because the house was eventually sold to an interracial couple, these facts prevent Plaintiff from making out a prima facie case of racial discrimination. However, where Defendant Cappelletti was on notice that her conduct could be interpreted as racially discriminatory, such as through the phone call by Ms. Ferguson to Ms. Cappelletti, a rational factfinder could conclude that Ms. Cappelletti would "want[] to avoid being accused of back-to-back incidents of discrimination."[1] See Murrell v. Ocean Mecca Motel, Inc., 262 F.3d 253, 259 (4th Cir. 2001). As such, this Court finds that the fact that Defendant Cappelletti showed the house to other black individuals later that day is not fatal to Plaintiff's case, and instead may be properly considered by a jury in its determination of whether Defendant Cappelletti suffered a prohibited racial animus against Plaintiff at the time he sought to enter the Open House. Therefore, the Court finds that Plaintiff has made out a prima facie case under § 1981 to defeat Defendants' Motion for Summary Judgment.

Because Plaintiff has made out a prima facie case, the burden then shifts to Defendants to show a legitimate, non-discriminatory reason for Defendant Cappelletti's actions. Defendant Cappelletti states that her legitimate, non-discriminatory reason for not allowing Plaintiff to enter the Open House was her fear that he and his companions were gang members. Additionally,

---

[1] Indeed, Ms. Cappelletti also states in her deposition that after the incident she notified Mr. Stevens, the broker-in-charge, of what had occurred because there "could have been a complaint" based upon Ms. Ferguson's telephone call. (Dep. Cappelletti, at 47.)

12

Defendant Cappelletti states that one of the individuals held his hand near to his crotch, which she took as indicative of potential sexual assault.

In response, Plaintiff argues that Defendant Cappelletti's stated reason, that is general fear and fear of sexual assault without any supporting evidence, is pretext. Plaintiff points to the fact that during Defendant Cappelletti's conversations with Ms. Ferguson and Deputy Ray, Ms. Cappelletti said nothing to justify her opinion that Plaintiff and his cousins looked like gang members, and in fact at that time did not mention what kind of clothing the men were wearing. Such failure to note this information is suspect, particularly because Ms. Cappelletti had just called the police and asked them to investigate Plaintiff and his cousins, but did not at that time give police a description of their clothing that could have allowed police to identify Plaintiff and his cousins had they remained in the neighborhood.[2] However, during Ms. Cappelletti's deposition, she insisted that one of the men was wearing a red t-shirt and a red bandana covering his head. Additionally, Ms. Cappelletti recalled during her deposition, more than a year after the incident, but not during her conversations with Ms. Ferguson and Deputy Ray, that, as previously stated, one of the men was standing with his hand on his crotch. However, during her deposition, Ms. Cappelletti could not remember if it was one or both hands that the man had on his crotch.

Because the nonmoving party in a motion for summary judgment is entitled to the benefit of all reasonable inferences, this Court will assume that Plaintiff is correct in asserting that no one

---

[2] While Ms. Cappelletti asserts in her deposition (Dep. Cappelletti, at 33.) that she told Officer Ray that one of the black men was wearing a red T-shirt and a red bandanna, such description does not also appear in Officer Ray's affidavit nor Officer Ray's accompanying police report. Nor did Ms. Cappelletti relate this detail to Ms. Ferguson during her phone conversation after Ms. Ferguson asked Ms. Cappelletti why she thought Plaintiff and his companions were gang members.

13

in his party was wearing either a red shirt or a red bandana.  Instead, according to Plaintiff, he and his cousins were casually dressed: Plaintiff in an orange, short-sleeved pullover shirt and shorts, Mr. Gause in a green and white football jersey and denim shorts, and Mr. Johnson in a white t-shirt and blue jeans.  Plaintiff also denies that any of the three men had a bandana of any kind on their heads.

Therefore, in terms of facts, this Court is left with these: Ms. Cappelletti told Plaintiff and his cousins to leave the Open House and not to return unless accompanied by a Realtor.  Ms. Cappelletti then immediately called the police for investigation into "three young black males dressed in gang-like clothing seeking entrance to an open house held by a Realtor." (Def. App. Mem. Supp. Mot. Summ. J., Ex. G, Aff. Ray, ¶ 2).  When Plaintiff's agent, Ms. Ferguson, called Ms. Cappelletti and pressed her for an explanation as to why she had denied Plaintiff admittance to the Open House, her explanation was that Plaintiff and his cousins looked like "gang members" and not like "typical buyers."  Ms. Cappelletti did not say anything to Ms. Ferguson to explain either opinion.  As such, Defendant Cappelletti has offered no other explanation for believing that Plaintiff and his cousins were gang members.  Consequently, this Court concludes that the continued use of the term "gang-like" or "gang member", along with the use of the racial descriptor "black", in the context of refusing to allow Plaintiff into the Open House and then calling the police to report his presence, raises an inference of a racially discriminatory attitude on behalf of Defendant Cappelletti that affected rights that were available to Plaintiff pursuant to § 1981.  See Williams, 2002 U.S. App. LEXIS 8057, at *19.

While it may be true that gang members may come in all races, it is the attitude and understanding of Defendant that controls.  Id. at *18-19 ("[O]ne could infer racially discriminatory intent merely by showing that the defendant assumed or implied that all gang bangers are black,

14

because it is the intent and attitude of the defendant that is relevant and not the intent and attitude of the population at large."); see also Agnew v. Bd. of Educ. of the City of Chicago, No. 97 C 5993, 1998 WL 386155, at *14 (N.D. Ill. July 7, 1998)(finding use of the description "gang members" who would "cause trouble" to describe a group of black eighth-grade students to be racially motivated). In this case, shortly after Plaintiff and his cousins were refused entry into the Open House property, Defendant Cappelletti told Plaintiff's agent, Ms. Ferguson, that there was no way she was going to let three black men into the house, because they did not look like prospective buyers, but instead they looked like gang members.[3]

Furthermore, Defendant Cappelletti's actions in changing the terms and conditions of the Open House as to Plaintiff but not as to other individuals that came to the Open House after Plaintiff supports an inference of pretext. See Bobbitt by Bobbitt v. Rage Inc., 19 F. Supp. 2d 512, 519-20 (W.D.N.C. 1998)(finding inference of racial discrimination where restaurant required black party to pre-pay for pizza, but not other individuals). In this case, not only did Ms. Cappelletti tell Plaintiff that he could come back to the Open House only with a Realtor, she also told Ms. Ferguson during their heated conversation that she was welcome to "bring [her] clients back,"[4]

---

[3] As stated in Defendant Cappelletti's deposition:
Q   And did you say to her that there was no way that you were going to let three black men in that house, that they did not look like prospective buyers?
A   I may have.
Q   Did you say that they looked like gang members?
A   I think I identified one as wearing what I felt could have been gang attire.
(Dep. Cappelletti, at 35, 36.)

[4] Defendant Cappelletti states in her deposition that she either said to Ms. Ferguson to "Bring your clients back, Mia," or "Tell your clients to come back." Taking the facts in a light most favorable to the Plaintiff, this Court finds that Defendant Cappelletti told Ms. Ferguson that she could bring the Plaintiff back to the house, not that Plaintiff was free to return to the house on his own.

15

(Dep. Cappelletti, at 37.), which suggests that Ms. Cappelletti continued to treat Plaintiff differently than other individuals who attended the Open House even after she was informed that Plaintiff was, in fact, a home buyer, which should have dispersed any legitimate "fear" she may have had of Plaintiff. Plaintiff had not been invited back to the Open House to attend on his own. Therefore, particularly because Plaintiff need not show that racial animus was the sole reason for Defendant Cappelletti's refusal to grant him entry into the Open House, see Asbury v. Brougham, 866 F.2d 1276, 1279 (10th Cir. 1989), accord Fuller v. Phipps, 67 F.3d 1137, 1144 (4th Cir. 1995)(race need not be sole motivating factor in the defendants' decision), Plaintiff has raised, by a preponderance of the evidence, an inference that Defendant Cappelletti discriminated against him on the basis of race and that her stated explanation, fear of gang members, is pretext.

Furthermore, inconsistent explanations can themselves be probative of pretext. EEOC v. Sears Roebuck & Co., 243 F.3d 846, 852-53 (4th Cir. 2001)("Indeed, the fact that Sears has offered different justifications at different times for its failure to hire Santana is, in and of itself, probative of pretext."); see also Johnson v. Toys "R" US-Delaware, Inc., No. 02-1926, 2004 WL 324545, at *8 (4th Cir. Feb. 23, 2004)(stating that the trier of fact can reasonably infer from the falsity of defendant's explanation that the defendant is dissembling to cover up a discriminatory purpose).

Therefore, it appears to the Court that Plaintiff has made a showing that Defendant Cappelletti's explanation is more likely false based on its own inconsistencies.[5] For these reasons, the Court finds

---

[5]Defendants argue that to the extent there is a difference in memory as to what Plaintiff and his cousins were wearing, this Court should not consider that to be a material fact. Instead, Defendants argue that it is the "genuineness of Cappelletti's fearfulness that is relevant and that fact is wholly undisputed." (Def.'s Memorandum Support of Def.'s Mot. Summ. J., at 18 n.13.) However, this Court would note that the color of the clothing is a material fact, to the extent that

16

that Plaintiff has raised material questions of fact as to his claims under 42 U.S.C. § 1981, and as such, Defendants' Motion for Summary Judgment must be denied.

B. 42 U.S.C. § 1982

Defendants have also raised a Motion for Summary Judgment with respect to Plaintiff's claim brought pursuant to 42 U.S.C. § 1982, which reads: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Section 1982 has been construed broadly, to "protect not merely the enforceability of property interests acquired by black citizens but also their right to acquire and use property on an equal basis with white citizens." Memphis v. Greene, 451 U.S. 100, 120, 101 S. Ct. 1584, 1597 (1981). Due to their common language and purpose, § 1981 and § 1982 are generally construed in tandem. Dobson, 240 F. Supp. 2d at 523-24 (citations omitted). As such, much of the previous discussion as to Plaintiff's claim under § 1981 also applies to § 1982. The only difference, in fact, is whether Plaintiff has put forth a prima facie case of discrimination in the form of interference with his right to inherit, purchase, lease, sell, hold, or convey real or personal property, sufficient to survive Defendants' Motion for Summary Judgment. Id. at 524. To satisfy this test, Plaintiff must show that he was subjected to a markedly hostile and objectively unreasonable environment that interfered with his ability to exercise his real or personal property rights so as to rationally support an inference of unlawful discrimination. Id.

---

Defendant Cappelletti exhibited reasonable fear of Plaintiff and his cousins based solely upon their purported dress in gang-like clothing. Were a jury to believe that Plaintiff and his cousins were not wearing either a red shirt or a red bandana, which Defendant Cappelletti now cites as the sole reason she believed that they were gang members, the jury could reasonably find that the only other reason Defendant Cappelletti had to think Plaintiff was a gang member was his race, which would be prohibited discriminatory conduct.

In this case, Plaintiff alleges that he favored the Camberly Drive house, and intended to place a bid on it. Instead, before he could make a final decision by attempting to visit the property during the Open House, Plaintiff was turned away at the door of the Open House by Ms. Cappelletti and told not to return unless he brought his Realtor. The Court finds that this markedly hostile treatment interfered with Plaintiff's ability to exercise his real property rights. As such, Plaintiff has made out a prima facie case under § 1982. As previously discussed, Defendants' only nondiscriminatory rationale for Plaintiff's treatment was Ms. Cappelletti's fear that Plaintiff and his cousins might have been gang members. And, as also previously discussed, the Court finds that Ms. Cappelletti's differing descriptions of Plaintiff and his cousins, in relation to both their dress and their behavior at the door to the Open House, is probative of pretext. Therefore, this Court finds that Plaintiff has made a showing that Defendant Cappelletti's explanation is likely false based on its own inconsistencies. Similarly with respect to Plaintiff's § 1981 claim, the Court finds that Plaintiff has raised material questions of fact as to his claims under 42 U.S.C. § 1982, and as such, Defendants' Motion for Summary Judgment must be denied.

C. Unfair and Deceptive Trade Practices

To show a violation under North Carolina's law against Unfair and Deceptive Trade Practices, N.C. Gen. Stat. § 75-1.1, ("UDTP") Plaintiff must show that: (1) Defendants engaged in conduct that was in or affecting commerce; (2) that Defendants' conduct was unfair or "had the capacity or tendency" to deceive; and (3) that Plaintiff suffered actual injury as a proximate result of Defendants' unfair or deceptive actions. Gilbane Bldg. Co. v. FRB, 80 F.3d 895, 902 (4th Cir. 1996).

Plaintiff argues that he has met this test, because selling real estate constitutes commerce

within the meaning of the UDTP, racial discrimination is an unfair and deceptive trade practice, and Plaintiff suffered injury as a result. In response to this claim, Defendants' sole argument is that Plaintiff has not established a prima facie case of race discrimination in violation of 42 U.S.C. §§ 1981 or 1982. Because this Court has found such a prima facie case, the Court additionally finds that Defendants' Motion for Summary Judgment on the North Carolina unfair and deceptive trade practices claim must be denied at this time as well.

IV. CONCLUSION

For the reasons discussed above, the Court finds that Defendant York Simpson Underwood, L.L.C., and Carol Cappelletti's joint Motion for Summary Judgment [Document # 19] is DENIED. Furthermore, Defendants' Motion in Limine [Document #21] is DENIED at this time.

An Order consistent with this Memorandum Opinion will be filed contemporaneously herewith.

This, the 9th day of June, 2005.

_____
United States District Judge